# Federal Defenders
## OF NEW YORK, INC.

Southern District
52 Duane Street-10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

---

Leonard F. Joy
*Executive Director and
Attorney-in-Chief*

*Southern District of New York*
John J. Byrnes
*Attorney-in-Charge*

November 27, 2007

**By Hand and Facsimile**

Honorable Alvin K. Hellerstein
United States District Judge
Southern District of New York
500 Pearl Street, Room 1050
New York, NY 10007

>  Re:  **United States v. Calvin Joyner**
>        07 Cr. 319 (AKH)

Dear Judge Hellerstein:

I write on behalf of my client, Calvin Joyner, in advance of his sentencing. Mr. Joyner has pled guilty to one count of possessing a firearm after having been convicted of a felony. As a result, he faces a guidelines range of 30 to 37 months in prison. For the reasons detailed below, the Court should sentence Calvin Joyner to 14 months in the custody of the Bureau of Prisons to be followed by supervised release, a condition of which should be his participation in the Fox Run program.

Only 20 years old, Calvin has had the most trying life and suffered hardships that, even for the strongest, would be almost impossible to overcome. One of three children, Calvin was the only one born to a crack-addicted mother. No one knew who fathered Calvin, and no one ever stepped up to claim him as a son. Calvin grew up without a mother's love or a father's guidance. As though these losses were not enough to cope with, Calvin's pre-natal addiction caused permanent cognitive and emotional dysfunction. All his life Calvin has played catch up without success.

Despite this unfair start in life, Calvin has remained in many ways a good and optimistic young man, who is trying hard, if not always successfully to overcome the obstacles life has thrown his way. Pre-sentence Report ("PSR") at ¶ 35. The one constant fact is that Calvin tries to do better, cares deeply for his family, and is able to hold a job. (PSR ¶ 50).

This letter is respectfully submitted to urge the Court to consider these life circumstances and impose upon Calvin Joyner a non-guidelines sentence. As detailed below, Calvin is capable of holding a job and thriving in a therapeutic environment.

Accordingly, we ask the Court to consider sentencing him to 14 months to run concurrent with the time he is serving on his state case. Upon completion of his custodial sentence, we ask for his release into a program - Fox Run - that is geared to help young men who are struggling with mental health and substance dependency issues. Residence in such a program should be mandated as a condition of his supervised release. Such a sentence will be sufficient and no greater than necessary to accomplish the goals of sentencing. United States v. Booker, 534 U.S. 220 (2005); United States v. Ministro-Tapia, 470 F.3d 137 (2d Cir. 2006). And, the sentence should and will reflect a personalized sentence. Id.; see also Nancy Gartner, *What Yogi Berra Teaches About Post-Booker Sentencing*, The Yale L. J. Pocket Part, 137 (2006), (hereafter "*Yogi Berra*") ("trial judges [should] behave as judges—distinguishing between Guideline rules of general application and their application to the individual case").

## BACKGROUND AND OFFENSE CONDUCT

Calvin is one of three children born to Caroline Joyner who spent her nine month pregnancy with Calvin smoking crack. Unlike her two earlier pregnancies, Calvin's mother used crack incessantly and when Calvin was born, and he tested positive for crack-cocaine. He also tested positive for congenital syphilis and a host of other bacterial infections. At birth, Calvin went through immediate withdrawal and to help him cope with the shakes, he was placed in the Neonatal Intensive Care Unit. Caroline's addiction to crack was so severe that Calvin needed three full months in a detox facility to vacate his body of the crack he has ingested through her use. At his release, he was three months old and developmentally delayed.

Although Calvin was released to his maternal grandmother's custody, his mother re-appeared and for the next two years she saw first hand the problems she had caused her son. As horrible as the first three months were for him, the worst was yet to come. Exposure to crack in-utero for nine months of Calvin's gestation laid the foundation for serious developmental and emotional deficits. When he was just 18 months old, the treating physician at the Presbyterian Hospital noted that his motor skills were subnormal and delayed. A baby, he was proclaimed a strong candidate for special education.

As he grew older, Calvin's problems became more apparent. Just shy of two years he was functioning at the level of 14-month old child. Doctors noted that he needed an infant stimulation program and reiterated the earlier diagnosis that he would most likely need specialized education.

Calvin's mother and grandmother started to address these medical issues and for awhile it seemed that they would be able to help the young boy with his challenges. However, just as he was about to turn three, Calvin's mother was shot dead in the middle of a street. This was a devastating loss for everyone. His older siblings, Kevin and Nicole, were mature enough to understand what had happened but as far as young Calvin was concerned, one day his mom was around and the next day she was gone. This was an unexplained loss and yet another hurdle for the young boy.

Matters continued to deteriorate over time and by the age of ten, Calvin had been diagnosed with Oppositional Defiant Disorder and Attention Deficit Hyperactivity Disorder. His grandmother did not know how and where to get him the treatment and help he needed. Without any help, Calvin ran amuck in the neighborhood. He had little ability to control his impulses and to his grandmother's dismay, he was easily manipulated by his peers. The boys in the neighborhood used him as the front man for their pranks. To illustrate, one afternoon, Calvin was talked into throwing stones at cars. When an irate car-owner who was the recipient of the neighborhood prank ran towards the kids, the other children were smart enough to run off. Calvin, however, was not quick enough to realize it was time to make haste. He received so hard a beating from the angry car-owner that he had his hip broken in two. At ten, Calvin underwent major surgery and spent an entire summer in a body cast.

Although Calvin's behavior escalated as he grew older, to his grandmother he remained a sweet and caring grandson who had been asked to endure so much more than seemed fair. It seemed even more unfair that no one could help him medically. Ultimately, Calvin was hospitalized at Sinai's Child Psychiatric Unit. Calvin remained in the hospital until he was transferred to Abbot House, a diagnostic center, before he was ultimately placed with his maternal aunt as another attempt at a therapeutic foster home.

Shortly after his seventeenth birthday, Calvin was arrested for attempted robbery. He entered a guilty plea and was sentenced to two years. While incarcerated, he served his time productively. He did well at vocational training in carpentry, plumbing, and mechanical installation, maintenance, and repair. Calvin was paroled in July 2006 and remained compliant and law-

abiding for the next six months until January 31, 2007 when he was arrested on the instant case. PSR ¶ 32.

On January 31, 2007, Calvin was taking the subway home and used his cousin's student Metro card to get on the train. When approached by two undercover police officers and ordered to produce identification, Calvin gave them his former inmate card. PSR ¶ 13. At their request, Calvin stayed with the officers as they conducted a warrant check, and once again honoring the officers' request, Calvin answered their questions honestly. PSR ¶ 14. When asked whether he had something on him that the officers should know about, Calvin truthfully told them that he had an unloaded gun. Calvin was arrested and taken to state court. From January 31st until April 17th, he was held in state custody. On April 17, 2007, he was indicted in the present case and writ to federal custody.

## DISCUSSION

### A NON-GUIDELINES SENTENCE IS REASONABLE AND APPROPRIATE IN LIGHT OF CALVIN'S INDIVIDUAL CIRCUMSTANCES

Just weeks ago, the Second Circuit reiterated that, post-Booker, a sentence must be based upon an individualized analysis of the particular characteristics of the defendant and his crime. United States v. Cavera, 05-4591-CR (2d Cir. October 11, 2007), Slip Op. at 6-7.[1] Accordingly,

> District judges are afforded wide latitude to impose non-Guidelines sentences based on case-specific applications of the § 3553(a) factors. For example, in Jones [460 F.3d 191 (2d Cir. 2006)] the district court had imposed a non-Guidelines sentence that was 50 percent below the bottom of the Guidelines range based on the judge's "gut feeling" about the defendant and findings on his personal circumstances. Id. In affirming the sentence we observed that a district court may consider the defendant's background together with the judge's "own sense of what is a fair and just sentence under all the circumstances," thereby fulfilling his or her "historic role." Id. at 195-96.

---

[1] In Cavera, the Second Circuit took the unusual step of withdrawing a previously issued majority opinion and substituting another opinion, to provide additional clarity regarding the importance of individualized sentencing in the post-Booker sentencing regime. See United States v. Cavera, 05-4591-CR (2d Cir. October 11, 2007), Slip Op. at 11.

Slip Op. at 16-17; <u>United States v. Crosby</u>, 397 F.3d 103, 114 (2d Cir. 2005) (emphasizing Second Circuit's expectation that post-Booker sentences will achieve more "individualized justice"); <u>see also</u> *Yogi Berra* (urging courts to stop imposing sentence in same formulaic manner as they did when guidelines were mandatory, and instead focus on the individual circumstances of each defendant in imposing sentence). Here, a case-specific application of the 3553(a) factors to Mr. Joyner's personal circumstances supports a sentence of time served with release to a residential facility.

*First*, regarding the history and characteristics of the offender, it is clear that Calvin has had terrible luck in life. Although each one of us is ultimately responsible for our actions, in Calvin's case it truly can be said that he never stood a chance at normal development. Despite his family's best efforts, he never received proper treatment; to this day, most of his problems stem from circumstances he could not control. To his family, he remains a good person who struggles with his own limitations. Most importantly, Calvin recognizes that he has issues with substance abuse and anger management. It is undisputed that Calvin wants to help himself, and realizes that there are situations in which he can make progress and thrive. A controlled therapeutic setting such as the one at Fox Run would allow Calvin to develop coping systems that will help his future assimilation into society. Daytop Fox Runs is an adolescent facility in Rhinebeck, New York, which specializes in helping adolescent males. Daytop Fox Runs has a contract with the Probation Office for the Southern District of New York and is run by teachers trained in special education. Post-graduation, Calvin will be released into a transitional center and will have help getting a job and an apartment, and will be slowly integrated into society. This program will help Calvin get back on his feet without putting society at risk. Additionally, Calvin's brother Kevin has written to the Court expressing his sincere desire and actual ability to help Calvin adjust to life after the Fox Run program. See, Letter attached hereto as Ex. A.

*Second*, as far as the nature and circumstances of the crime is concerned, we ask the Court to consider that Calvin's actions, though wrong and serious - carrying an unloaded gun - were not such that reflected a desire to cause immediate harm or immediate danger to society.

*Third*, in considering the needs of the public, there is indication that both the public and Calvin would benefit from a controlled but therapeutic environment. Continued incarceration will not help Calvin change it will merely harden him and further

attenuate his ties to his family. It is respectfully submitted, that the needs of the public include the needs of Calvin, his grandmother, and his siblings. Surely, society has an interest in avoiding the unnecessary destruction of their family and getting Calvin the help he needs.

As to specific and general deterrence, Calvin has realized the error of his ways. He is sincerely remorseful and ashamed for the harm he has brought upon himself and his grandmother and siblings. The time already spent in prison, and the emotional impact that time has had upon him and his family, constitutes adequate specific deterrence as to him. He will never break the law again.

*Fifth*, in considering the possibility of vocational training and education, it is unlikely that Calvin will benefit from the programs available at the BOP. While vocational training may be of some slight benefit to him, it certainly does not outweigh the benefits involved in sending him to the Fox Run program where he can begin rebuilding his life. Additional jail time will only serve to wreak further havoc upon Calvin and further separate him from his family.

Finally, a sentence of 14 months will avoid unwarranted sentence disparities among similarly situated defendants. Placing Calvin in a residential facility for twelve months following his 14 month sentence will functionally result in his serving an additional term of incarceration on this charge. It is important to note that a similar arrest in state court would result in a much lower sentence than the sentence being requested here. See, U.S. v. Brennan, 96 Cr. 793 (E.D.N.Y. 2007) (Judge Weinstein noted that state vs. federal sentencing disparity is a proper factor to consider).

Thus, imposing the requested sentence would not result in a sentencing disparity between Calvin and others convicted of possessing unloaded guns. Nor would it result in a sentencing disparity between Calvin and others more precisely similarly situated to him: adolescents who had a felony at the time they possessed the gun, and have serious histories of family problems, learning disabilities, and substance abuse issues.

In sum, a sentence of fourteen months followed by a year at the Fox Run program meets each of the 3553(a) factors and the overarching goal of a sentence no greater than necessary to accomplish the goals of sentencing. Ministro-Tapia, 470 F.3d 137 (2d Cir. 2006).

## **CONCLUSION**

Applying the purely advisory guidelines here would result in a sentence inappropriate to the defendant, the facts, and the crime. Instead, for all the foregoing reasons, it is respectfully requested that the Court sentence Calvin Joyner to a 14 month custodial sentence to run concurrently with the time he is serving on his state case to be followed by 12 months in the Daytop Fox Run treatment facility.

Respectfully submitted,

Sabrina P. Shroff
Assistant Federal Defender

WZB/sps/dvd

cc: AUSA John Zack
    (by ECF)

# EXHIBIT A

Dear Judge Hellerstein,

My name is Kevin Joyner and I am writing to you in regards to Calvin Joyner and would like to help him in any way that I can.

Your Honor, I understand the situation that Calvin is in and I would love more than anything for him to come and live with me once this matter is all over with. I am very much anticipating the day Calvin is released so, I can be a positive influence to him, which he never had growing up. I have been employed at Blackman Plumbing Supply in Huntington, NY for 4 years now and am capable of opening up the opportunity for Calvin once he's released. I recieved my GED in 2000 and am also raising a beautiful baby girl; Calvin's neice.

In closing, I hope that I can be of any assistance in your sentencing and will greatly appreciate it. Thank You.

Sincerely,
Kevin Joyner